IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TYRONE MARTIN,<br>Plaintiff | ) | |
| | ) | |
| | ) | No. 1:18-cv-00215 (Erie) |
| v. | ) | |
| | ) | |
| JOHN WETZEL, et al.<br>Defendants | ) | Richard A. Lanzillo |
| | ) | United States Magistrate Judge |
| | ) | |
| | ) | ECF No. 116 |

**MEMORANDUM OPINION**

I.     Introduction

Plaintiff Tyrone Martin commenced this civil rights action against multiple individuals employed by the Pennsylvania Department of Corrections (DOC) at its State Correctional Institution at Forest (SCI-Forest) pursuant to 42 U.S.C. § 1983. ECF No. 5. Martin alleged violations of his constitutional rights stemming from corrections officers' use of force and disposal of his property on May 29, 2018. The Defendants have filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56. ECF No. 116. For the following reasons, the Defendants' motion will be granted.[1]

II.     Background

A.  Martin's Allegations

Martin's complaint alleged that the Defendants violated his civil rights during and after an incident in which prison officials removed him from his cell on May 29, 2018. ECF No. 5, pp. 2–5.

---

[1] Martin has appealed this Court's order denying his motion for sanctions to the United States Court of Appeals for the Third Circuit. *See* ECF No. 142. While an appeal normally divests the district court of jurisdiction, this is not the case where "an appeal is taken from a non-appealable order." *See Roudabush v. Bitener*, 722 Fed. Appx. 258, 262 (3d Cir. 2018) (per curiam) (citing *Venen v. Sweet*, 758 F.2d 117, 121 (3d Cir. 1985)). Because the order denying Martin's motion for sanctions was plainly a non-appealable interlocutory order, *see Simon v. Robinson*, 196 Fed. Appx. 54, 55 (3d Cir. 2006) (per curiam) (citing *Babcock & Wilcox Co. v. Foster Wheeler Corp.*, 457 F.2d 1307, 1308 (3d Cir. 1972)), this Court retains jurisdiction to proceed in this action.

*See also* ECF No. 99 (Martin's Pretrial Statement). Martin's complaint expressly raised several legal claims against the Defendants in their individual capacities: an Eighth Amendment excessive force claim based on the officers' conduct in removing him from his RHU cell; a Fourteenth Amendment due process claim based on the disposal of his property after the use of force incident; a retaliation claim based on the officers' use of force and disposal of the his property; a civil conspiracy claim; and a Sixth Amendment violation claim.[2] The Court has also construed his complaint to assert the following additional claims: deliberate indifference to his conditions of confinement; failure to protect him from self-harm; deliberate indifference to his serious medical need; and denial of his right of access to the courts.

Martin alleged he experienced a "mental breakdown" on May 29, and he asked Defendant Mrozek to "speak with someone from psychology," but his plea for help was ignored by both Defendant Mrozek and Defendant Kopp in retaliation for unspecified reasons. ECF No. 5, p. 2. Rather than provide aid, Defendant Kopp requested a "use of force team," which sprayed Plaintiff with Oleoresin Capsicum (OC) spray. *Id.* at pp. 2-3. After being sprayed, Martin was treated by "Jane Doe (nurse)" who "acted with neglect as she only clean Plaintiff (sic) eyes and ignored Plaintiffs (sic) pleas." *Id.* at p. 3. Officers then threatened, handcuffed, and placed Martin on the floor while naked for an anal cavity search. *Id.* Martin further alleged that when the use of force team returned him to his cell, they "hit" him and "touch[ed]" him with "excessive force." *Id.*

Martin also alleged that on the same day, Defendants Mason, Mrozek, and Kopp removed his legal materials and personal property from his cell and failed to provide him with a "153 Form." *Id.* at p. 3. Defendants once again used OC spray on him, including spraying his penis with the chemical. *Id.* Defendants allegedly refused to allow him to decontaminate his body following the

---

[2] The Court previously granted the Defendants' motion to dismiss all claims against Defendants Wetzel and Overmyer as well as claims against all defendants in their official capacities. ECF No. 50.

spray. *Id.* at 4. They gave him a paper smock and returned him to his cell without providing him with a mattress, blanket, clothes, or shoes (despite the floor being wet) from May 29, 2018, to June 5, 2018. *Id.* at pp. 3-4. Martin's feet became infected until he received "foot cream" on June 5, 2018. *Id.* at p. 4.

Martin further alleged that the "Superintendent," Sloan, Mason, Kopp, Lee, and Mrozek later disposed of his property, which had been seized during his removal from his cell, as a "retaliatory tactic." *Id.* at 4. Additionally, Sheesley from the Psychology department "falsified documents and records stating that on 5-29-18 she offered Plaintiff an out of cell [visit] but cctv [video] would show she never once spoke to Plaintiff (sic)." *Id.* at pp. 4-5. He generally alleged that the Defendants "falsify documents and steal state funding." *Id.* at 5. Martin seeks over 1.6 million dollars in compensatory and punitive damages and litigation costs. *Id.* at 6.

B. Relevant Procedural History

The Defendants filed the pending motion for summary judgment, a brief in support, a concise statement of material facts, and an appendix of exhibits on October 26, 2020. ECF Nos. 116–119. Martin filed his concise statement of material facts which responded to the numbered paragraphs of the Defendants' concise statement and a "Cover Letter" which generally objected to all forty-seven paragraphs of the Defendants' concise statement. ECF Nos. 126, 126-1. The Defendants' filed a reply brief. ECF No. 137. The matter is ripe for decision.

C. Composition of the Record

The record includes video of events from May 29, 2018, from two cameras. One is a stationary camera that captured only video (no audio) of Martin's housing unit. The second video recorded from a handheld camera that followed the actions of Martin and prison personnel on May 29. This camera includes both video and audio. The Defendants also provided the Extraordinary

3

Incident Report written by SCI-Forest staff about the planned use of force to remove Martin from his cell on May 29, the records for Inmate Grievances # 740433 and # 740787, Martin's Inmate Cumulative Adjustment Records (ICAR) Notes—including notations from the Psychology Department dated May 29, 2018, and an affidavit from Lt. Colby Hollis who supervised removal of Martin from his cell. ECF No. 119. Martin provided a page of his medical records from a visit with medical staff on June 5, 2018, grievance records, papers regarding his lost property, an affidavit from himself, and other documents.[3] ECF Nos. 126, 127, 130, 134.

III.    Standard of Review

A. Summary Judgment

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn therefrom in favor of the nonmoving

---

[3] Hollis' and Martin's affidavits meet the requirements of 28 U.S.C. § 1746 for the use of unsworn declarations in federal court.

4

party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Further, under Rule 56, a defendant may seek summary judgment by pointing to the absence of a genuine fact issue on one or more essential claim elements. The Rule mandates summary judgment if the plaintiff then fails to make a sufficient showing on each of those elements. When Rule 56 shifts the burden of production to the nonmoving party, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

B. *Pro Se* Litigants

Martin is proceeding *pro se*. A filing from a *pro se* litigant is to be "liberally construed" and a "pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89. 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 206 (1976)); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). Additionally, when considering a motion in a *pro se* plaintiff's case, a court must "apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name." *Holley v. Dep't of Veteran's Affairs*, 165 F.3d 244, 247-48 (3d Cir. 1999). On a motion for summary judgment, however, "a pro se plaintiff is not

relieved of his obligation under [Federal Rule of Civil Procedure] 56 to point to competent evidence in the record that is capable of refuting a defendant's motion for summary judgment." *Dawson v. Cook*, 238 F. Supp. 3d 712, 717 (E.D. Pa. 2017) (citation omitted). Put another way, just because a non-moving party is proceeding *pro se*, he is not relieved of their "obligation under Rule 56(c) to produce evidence that raises a genuine issue of material fact." *Id.* (quoting *Boykins v. Lucent Techs., Inc.*, 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000)); *see also Winfield v. Mazurkiewicz*, 2012 WL 4343176, *1 (W.D. Pa. Sept. 21, 2012).

IV.    Analysis

   A. Defendants Are Entitled to Summary Judgment on Martin's Excessive Force Claim.

      1. Legal Standard for Eighth Amendment Excessive Force Claims

Martin claims that corrections officers used excessive force in violation of the Eighth Amendment by allegedly subjecting him to an anal cavity search, hitting and touching him, and using OC spray during and following his cell extraction on May 29, 2018. ECF No. 5. The Defendants argue that the force used was a reasonable response to Martin's actions and was applied solely to gain his compliance and in furtherance of legitimate penological interests. ECF No. 116, ¶ 11. In support of their position that no genuine dispute of material fact remains for trial and that they are entitled to judgment as a matter of law, the Defendants rely primarily on "the immutable video evidence," which they assert demonstrates conclusively the reasonableness and necessity of the force used on May 29. ECF No. 117, pp. 5-6.

An Eighth Amendment claim has an objective and subjective component. *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995, 117 L.Ed.2d 156 (1992). The defendant must act with a "sufficiently culpable state of mind," and the conduct must be objectively harmful enough to violate the Constitution. *Wilson v. Seiter*, 501 U.S. 294, 298, 303, 111 S. Ct. 2321, 115 L.Ed.2d 271 (1991).

For the subjective component of an excessive force claim in the prison context, the "core judicial inquiry" is whether "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Ricks v. Shover*, 891 F.3d 468, 480 (3d Cir. 2018). *See also Hudson*, 503 U.S. at 6-7, 112 S. Ct. 995. A touchstone of the analysis is that the Eighth Amendment prohibits prison officials from unnecessarily and wantonly inflicting pain in a manner that offends "contemporary standards of decency." *See Hudson*, 503 U.S. at 8-9, 112 S. Ct. 995. For the subjective component, the court must analyze several factors: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'" *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Whitley v. Albers*, 475 U.S. 312 (1986)). For the objective component of an Eighth Amendment claim, the injury must often more than "de minimis" to violate the Constitution, *see Gibson*, 837 Fed. Appx. at 862 (citing *Fuentes v. Wagner*, 206 F.3d 335, 345 (3d Cir. 2000)), but even a "de minimis" use of force could be "constitutionally significant" where the force is "repugnant to the conscience of mankind." *Brooks*, 204 F.3d at 107 (quoting *Hudson*, 503 U.S. at 9-10). "Injury and force…are…imperfectly correlated, and it is the latter that ultimately counts." *Wilkins v. Gaddy*, 559 U.S. 34, 38, 130 S. Ct. 1175, 175 L.Ed.2d 995 (2010).

When the events at issue have been captured on video, the court must consider that evidence in determining whether there is any genuine dispute as to material facts. *See Scott v. Harris*, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The court must view the facts "in the light depicted by the video[]." *See id.* (relying on a video recording in assessing summary judgment evidence). At summary judgment, "where there are video recordings of the incident in question, we need not adopt the non-movant's version of the facts if the recording 'blatantly

contradict[s]' the non-movant's version 'so that no reasonable jury could believe it.'" *McDowell v. Sheerer*, 374 Fed. Appx. 288, 291-92 (3d Cir. 2010) (*citing Scott*, 550 U.S. at 380, 127 S. Ct. 1769). If a review of the video "refutes an inmate's claims that excessive force was used against him, and the video evidence does not permit an inference that prison officials acted maliciously and sadistically, summary judgment is entirely appropriate." *Smalls v. Sassaman*, 2019 WL 4194211, at *8 (M.D. Pa. Sep. 4, 2019) (citing *Tindell v. Beard*, 351 Fed. Appx. 591 (3d Cir. 2009)). *See also McCullon v. Saylor*, 2013 WL 1192778, at *14 (M.D. Pa. Mar. 4, 2013) ("[I]n assessing ... claims in a case where an encounter is captured on videotape we are mindful of the fact that when [the] 'videotape refutes [an inmate's] assertion that defendant[s] used excessive force,' or when the 'video shows that [an inmate] did not suffer any physical distress' ... we should conclude 'viewing the evidence in the light most favorable to [the inmate that], no reasonable finder of fact could view the video of the incident and determine that [defendants] acted maliciously and sadistically,' and may enter summary judgment on the excessive force claim.") (quoting *Tindell*, 351 Fed. Appx. at 596).

### 2. The Record Evidence

The video recordings captured the entire use of force incident on May 19, 2018.[4] There are two video recordings. ECF No. 119. Disc one contains video (but no audio) from a stationary camera in Martin's housing unit which faces his cell. Discs two, three, and four contain video and audio from a handheld camera that followed the events, focusing on Martin. The videos' time stamps begin at zero and proceed by the second.

Disc two, file one of two, contains video and audio from the handheld camera, beginning with a short briefing before the planned use of force to remove Martin from his cell. The video

---

[4] Martin repeatedly asserted throughout the litigation that the Defendants engaged in spoliation of evidence for failure to preserve more video evidence. *See* ECF Nos. 122, 136, 151 (opinions and orders). The Court concluded that there was spoliation of one video, but that no sanctions were warranted because that stationary camera captured no audio, was only black and white, and other available video evidence from the handheld camera captured all relevant events in color video with audio, and thus there was no prejudice to Martin. *See* ECF No. 136. *See also* Fed. R. Civ. P. 37(e); *GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76 (3d Cir. 2019).

records Lt. Hollis announcing that he had assembled a compliance team of three corrections officers for Martin because he has tied his cell's door shut with a sheet, propped a mattress against the door, and spread soap on his floor. ICAR notes confirm that when Martin blockaded his cell, he requested to speak with "psych." ECF No. 119-1, pp. 46-47. Defendant Psychological Services Specialist Jodi Lynn Sheesley offered him an out-of-cell visit with Psychology; Martin refused to be seen out of his cell. *Id.* at p. 47. When that offer failed, Lt. Hollis assembled the officers to plan their removal of Martin from his cell. Officer M'Noughton operated the handheld camera. Officer Jack held a body shield. Officer Smith held the OC spray cannister. Officer Hagg held shackles, handcuffs, and an electronic body immobilization device (EBID), otherwise known as a taser. The handheld video recorded Nurse Johnson advising the corrections officers that Martin had been cleared for the use of OC spray and EBID. At 2:40 on the video meter, the camera records all officers donning masks and departing for Martin's cell.

At 4:03, Hollis directs Martin to uncover his cell door and come "cuff up." Martin says something inaudible. Martin's cell door is covered with a sheet, blocking the view through the windows. Lt. Hollis gives six orders in total for Martin to come cuff up. Martin does not comply. At 4:45, officers unlock the wicket—the waist-height opening on a cell's door. At 5:03, officer Smith begins deploying OC spray for about six seconds. Lt. Hollis then orders Martin to come cuff up. Hollis says an officer deployed OC spray at 16:13 hours. Martin ignores further orders to uncover his door. Martin finally approaches the door at 16:40, and officers handcuff him through the wicket. At 17:06, officers open the door. They grasp Martin's upper arms and guide him away from his cell.

Martin slides down to his knees. In response, the officers pause, allowing Martin to regain his footing. Lt. Hollis orders him to stand up. Martin refuses to walk, so the officers lift him up by

his upper arms and pull him across the floor with Martin's lower legs dragging as they take him to the Medical Department.

Disc one from the stationary camera in the housing unit shows that after the officers leave the housing unit with Martin at 4:18:36, several DOC staff go to Martin's cell. They remove the sheet from his cell's doorway, remove his mattress, and place his property into a large plastic trash bag which they also take away. Staff bring a mop and clean the cell, including the floor and the interior side of the door to Martin's cell, wiping away the residual OC spray.

Returning to the handheld video, at 7:50, the officers and Martin reach the medical unit. Martin's breathing sounds raspy and tired. Two officers hold his upper arms and shoulders while he sits. Nurse Johnson washes out both of his eyes at 8:20. At 9:30, Martin says he is injured on his chest and neck. No injuries are visible. Nurse Johnson completes her examination at 10:15.

Martin stands up and steps out of the medical unit with the officers at 10:25. He then goes to the ground and says, "I need a chair, man." Officers refuse, so Martin declines to walk and says, "then drag me, man, drag me, man. Go ahead." The officers lift him up by his arms and legs and carry him through a hallway. At 11:19, just as officers approached a doorway, Martin said, "Why are you banging my head? You banging my head on the wall." While at that moment Martin's head and body are partially obscured by the officers carrying him, nothing in the officer's movements supports that they caused his head impact the wall or that they were swinging or pushing him into the wall.

At 11:25, the corrections officers are seen placing Martin on the ground in the strip cell (also called a "strip cage"). At 11:29, Martin says, "Go ahead. Y'all can roll, man," appearing to egg on the officers. Martin refuses orders to stand, citing chest pains. Lt. Hollis says they need to uncuff him to get him in a new jumpsuit. Officers assist him to his feet. At 12:13, they close the strip

cage's door. They unlock his handcuffs through the wicket, and then close it. Martin rests on the ground. At 12:39, Hollis orders him to stand up for a strip search, but Martin remains on the ground. Hollis orders him up again at 13:07. Martin says he will not return to his cell, is not resisting, and cannot stand up. The officers allow him to rest for a minute.

At 14:15, Martin asks if this is how they treat suicidal prisoners and Lt. Hollis orders him up again. Martin refuses numerous, repeated orders over several minutes to stand up for the strip search and get a new jumpsuit, citing chest pains and struggles to breath. However, he speaks normally or yells throughout the process. Hollis twice warns Martin that they will use OC spray again if he refuses to get up, at 17:20 and 18:10. At 18:40, Martin finally begins taking his jumpsuit off, over seven minutes after entering the strip cage and the first order that he do so. At 19:40, officers open the wicket and Martin puts his clothes through it.

At 20:35, Martin says he feels suicidal and "might not make it through the night." Officers conduct a strip search. It becomes contentious because Martin ignores multiple, repeated orders throughout the process designed to expose anything hidden. Martin is continually noncompliant. For several minutes, Martin refuses to bend over as part of the strip search. Disc 2, file 1 of 2, ends with Martin arguing with corrections officers about the strip search.

Disc 2, file 2 of 2, continues where file 1 of 2 left off, with video and audio from the handheld camera. Hollis at 00:40 again orders Martin to bend over and spread his legs to continue the strip search. Martin refuses, so Hollis orders him to put his hands in the wicket to cuff up. Martin argues against several orders to do so. Martin finally puts his hands through the wicket at 2:55, and an officer handcuffs him. Officers open the strip cage door at 04:00.

Officers hold Martin's arms. An officer places a sheet on the ground in front of him. At 4:30, Martin kneels on the sheet. Officers put their hands on his back and sides, and then they rock

him back and forth from side to side. An officer confirms that Martin is clear from the strip search, and two officers assist him to his feet at 5:00. Martin requests a Prison Rape Elimination Act (PREA) form at 5:10.

The officers place him back in the strip cage and uncuff him through the wicket. They hand him a Velcro-fastened smock through the strip cage at 5:55. Martin requests a PREA form over and over. Hollis says he will be placed back in his cell, which staff had decontaminated. At 7:10, officers order him to pass his smock out of the strip cage so they can give him a jumpsuit. Martin requests psychology at 7:45, concerned for his mental health, saying that he "doesn't trust himself" in his RHU cell. Martin put on the jumpsuit at 8:20. He continues to request psychology. Officers hand him slide shoes. At 9:50, he says he feels suicidal.

At 10:20, Hollis said Martin would be sprayed with OC spray again if he did not cuff up. They cuff Martin, and at 11:00, they remove him from the strip cage. Officers walk him down the hall back to the RHU, flanking him with their hands on his upper arms. At 12:00, they walk into the RHU. At 12:25, they arrive at his cell. Officers order him to remove his slides, but he refuses. Martin complains that his cell is still wet. Officers slowly push him into the cell with their hands on his upper arms and back. At 12:57, Martin says, "The fuckin' floor wet. I ain't steppin' on no fuckin' wet floor. I'm not steppin' on the wet floor. We can do the spray again and we can go back to that fuckin' strip cage and get the fuckin' nurse again." Hollis orders Martin to step out of the cell at 13:20, and he complies. At 13:24, Hollis orders him to pick up his feet, which he refuses. Hollis orders the officers to take him in and kneel him on the bed.

Two officers move Martin into his cell, and Martin goes out of sight at 13:35. He is visible again at 13:39 after the cameraman repositioned. At 13:38, Martin says, "They hit me." At 13:39, he says, "They punchin' me. He just punched me." The shoulders of both officers holding him are

visible during this time, and they do not rear back, cock their shoulders, or otherwise show any indication that they have or were preparing to punch or strike Martin. At 13:39, Martin is visible, and no officer is hitting or striking or punching him. Martin yells over and over that he has been punched, but no punch is seen on camera. Martin requests a nurse, claiming an injury. He does not appear in pain, further belying any claimed injury or excessive application of force.

Hollis orders Martin to kneel on the bed, which he refuses. Hollis then orders him to kneel on a chair. At 14:16, Martin yells that he has been punched again. The video contradicts Martin; officers in full view of the camera did not strike him. Officers order him to kneel on the stool, which he refuses. At 14:23, two officers hold him against the wall to remove his slides. At 14:30, Martin yells, saying, "he fuckin' me up." Again, no one is hitting him.

At 14:50, Hollis tells an officer to retrieve Martin's slides from his feet. Two officers hold his shoulders and one kneels down to remove his shoes. At 14:55, Martin yells, "He stuck his finger in my ass." Martin smirks at the camera while repeating this. No one did this, as is obvious because Martin's posterior is clearly visible on the video at this time. Between 15:25 and 15:27, Martin moves in and out of view of the camera. At 15:27, he appears yelling and leaning back into the officers. He stands back up on his own at 15:31. Martin leans back again, and the officers stand him back up at 15:38. Martin again falsely claims an officer has punched him; video shows that this did not occur.

At 15:44, Martin leans back and pushes his right shoulder into the wall. A similar motion occurs at 15:48. The video of this second movement does not show any use of force by the corrections officers to push Martin into the wall and appears to be Martin lunging his right shoulder into the wall. Hollis is heard commenting that Martin, not the officers, is initiating this movement. At 16:05, Hollis observes Martin again leaning back on the officers, so Hollis orders officers to

move him to the door of his cell for handcuffing. The events visible on the video plainly contradict any allegation that officers slammed or pushed Martin's shoulder into the wall. Martin also showed no sign of injury. Officers close the cell door at 16:30, and handcuff him through the wicket.

The handheld camera remains at the cell door. At 17:00, Martin starts yelling again. Martin removes his jumpsuit. At 18:20, he starts twisting it up and tying it to the top bunk of the bed. At 18:41, he sits on the lower bunk, wraps the tied-up jumpsuit around his neck, and starts to lean his neck back, attempting to hang himself. He is not suspended in the air, still lying somewhat seated on the lower bunk with his legs outstretched to a shelf across from the bed. Comparing times from the handheld camera to the stationary camera shows that just after Martin had leaned back with the jumpsuit around his neck, the officer with the handheld camera (at 4:54:35) gestures behind him, and another officer approaches. Audio from the handheld camera at 19:00 shows that the handheld camera operator says that Martin is attempting to "hang up." At 19:11, the jumpsuit falls down, and so does Martin. Martin immediately re-ties the jumpsuit to the bedframe and his neck and, at 19:42, he is visible again leaning back in an apparent effort to hang himself.

Officers are seen returning to Martin's cell at 20:50. Hollis twice orders Martin to come to the door to be handcuffed. Martin ignores these orders. Hollis unlocks the wicket, an officer sticks OC spray in the wicket, and deploys it for three seconds. Martin visibly reacts. At 21:25, he begins untying himself. He puts on the jumpsuit. At 22:30, Martin comes to the door, and officers handcuff him. They open his door at 22:52, grasp him by the arms, remove him from the cell, and walk him out of the RHU.

Martin walks normally. At 23:28, he reiterates that he feels suicidal. At 23:45, they enter the medical unit. Nurse Johnson treats him for the OC spray, flushing his eyes. At 25:17, Martin claims he was punched on the right side of his face and asks the nurse to take a picture of it. No injury is

visible. At 27:38, Hollis tells Martin he was sprayed with OC because he had his jumpsuit tied around his neck and would not come to the door to cuff up. At 27:50, the officers escort Martin from the medical unit to the strip cage. Disc 2, file 2 of 2, ends with the officers walking him into the strip cage.

Disc 3 continues where the previous disc left off from the handheld camera with video and audio. Martin is in the strip cage. At 00:30, Martin claims an injury to his wrists, saying, "they fucked my wrists up." At 00:35, an officer orders him to pass out his jumpsuit. Martin refuses to comply, insisting he needs it to wipe OC spray off his testicles. At 1:55, Hollis tells Martin that they have someone from the psychology unit coming to see him. At 2:46, Hollis warns Martin that he will be sprayed again if he does not hand over the jumpsuit. At 3:03, he hands it over, and in return, officers hand him a white, paper smock. Martin says he will urinate on the floor. At 3:57, the team of corrections officers leaves.

Martin paces around the strip cage for a couple of minutes, complaining about his treatment. At 6:52, Martin says he will urinate on the floor if he is not given a cup to use instead. Hollis tells him to hold it. At 9:30, Hollis says that a psychiatrist is here to talk with Martin. At this point, the person holding the handheld camera steps back and a door closes.

The camera faces through a glass pane in the door, looking into the strip cage room at Martin and the psychiatrist. The conversation between them is inaudible. At 15:48, the psychiatrist gets up and opens the door. At 17:25, Martin takes up his paper smock and starts twisting it up. Soon after, Hollis and the corrections officers return to the strip cage room, and Hollis orders him to come to the door to cuff up. At 18:39, Martin says the cuffs are too tight. Martin, handcuffed, steps out of the strip cage, and corrections officers wrap the lower half of his body in a Velcro jumpsuit.

At 19:34, Hollis tells Martin they are returning him to the same cell. Martin then says, "alright, I'mma use this motherfuckin' smock to kill myself." Martin adds, "one of us is going to get tired of this shit before I'm dead as a doorknob." At 20:20, the corrections officers return Martin to his cell and close the door. The officers leave.

Almost immediately, at 21:05, Martin begins twisting his paper smock into a type of rope and then ties it to the top bunk of his bed. At 22:20, Martin sits on the lower bunk and wraps the smock around his neck. He shouts something unintelligible. At 22:55, he has the paper-smock tied around his neck and sits back, leaning his neck back slightly. At 23:18, he turns, leans back, and sticks his legs out across his cell, propping his legs up on something. Martin faces upward with the smock around his neck with the main tension point on the back of his neck.

At 23:35, Hollis is heard calling the use of force team back for an emergency entry into Martin's cell. At 23:40, Martin lifts his hand up to adjust the smock around his neck. At 24:05, the smock comes undone, and Martin stands up. He tries to tie up the smock again. At 24:33, after a voice is heard saying, "They're coming to get you," Martin says he has "to piss first" and stands at his toilet to urinate. The handheld camera operator switches to another camera in response to a low battery warning.

Disc 4 resumes recording video and audio from the handheld camera where the previous disc ended. At 00:08, the handheld camera operator tells the officers that Martin tried to hang up with his paper smock. Hollis then speaks to Martin and warns him that he will have to use OC spray on him again if he tries again to hang himself. Martin yells and again tries to fashion his smock into a rope. But at 00:45, Martin stands up at the toilet in the cell. Afterwards, he again starts twisting up the smock.

Hollis leaves at 1:45. At 2:30, Martin untwists the smock and puts it on. The handheld camera remains focused on the cell for a couple of uneventful minutes, and at 4:45, the handheld camera turns away from the cell, and the man holding it walks out of the RHU. At 5:00, Hollis, the security team, and Nurse Johnson begin a debriefing in the hallway. Hollis calls out that the time is 17:38. Hollis describes the events of the use of force incident beginning with the first application of OC spray and cell extraction. At 10:15, Officer Jack says that while they were with Martin in his cell, it was Martin who was thrusting himself at the cell wall, not the officers. At 10:40, Hollis states that Martin made accusations throughout the strip search that he was being assaulted, but that no such thing occurred. Then, Hollis concludes the debriefing, and the video from the handheld camera ends.

### 3. Excessive Force Analysis

The parties agree that the officers used force against Martin. They deployed OC spray in his cell on two occasions, lifted him by his arms and legs when he refused to walk, conducted a strip search, and generally limited his movements. Given this, the Court must consider each of the five factors identified by the Supreme Court in *Whitley v. Albers, supra,* to determine whether that force "was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 7, 112 S. Ct. 995. The result is clear: none of the officers used excessive force. On the contrary, officers showed commendable patience interacting with an uncooperative inmate.

Regarding the first *Whitley* factor, the videos indisputably establish that corrections officers repeatedly needed to use some level of force throughout their interaction with Martin on May 29, 2018. Martin had covered the windows of his cell with a sheet, violating prison rules. Even though he requested to speak with someone from the Psychology Department, when Martin was offered an out-of-cell visit with PSS Sheesley, he declined. ECF No. 119-1, pp. 46-47. He refused six orders

from Lt. Hollis and corrections officers to come to the cell's door, uncover it, and cuff up. This necessitated the use of OC spray. *See Jones v. Wetzel*, 2017 WL 4284416, at *7–9 (W.D. Pa. Sept. 27, 2017) (granting summary judgment on excessive force claim where officer used OC spray when inmate covered his cell window and refused multiple orders to uncover it). Martin's refusal to walk from his cell to the Medical Department and from there to the strip cage required officers to carry him by his upper arms and legs. Martin's noncompliance with the contactless strip search required officers to conduct the search by hand; they handcuffed him, had him lie down on a sheet, and lightly rolled him from side to side to make sure nothing was hidden on his person.

Officers also needed to use some force when Martin attempted to hang himself with his jumpsuit in his cell. Using OC spray to prevent self-harm under these circumstances was appropriate. *See Gibson v. Fleming*, 837 Fed. Appx. at 862 (affirming grant of summary judgment on excessive force claim for defendant corrections officers who used OC spray on an inmate who told them he was suicidal and had tied a sheet around his neck). After both uses of OC spray, officers promptly escorted Martin to the Medical Department for treatment where Nurse Johnson flushed his eyes. Faced with a visibly agitated prisoner, willing to harm himself, who was repeatedly noncompliant throughout his two removals from his cell, some use of force was clearly appropriate. No reasonable jury could find otherwise. This factor favors summary judgment.

Evaluating the second *Whitley* factor requires the Court to compare "the relationship between the need and the amount of force that was used." *Brooks*, 204 F.3d at 106. The Court must assess the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). Here, the video and other evidence confirm that the amount of force used throughout the incident was reasonable.

"The use of chemical agents to subdue recalcitrant prisoners is not cruel and unusual when reasonably necessary." *Gibson v. Flemming*, 837 Fed. Appx. 860, 862 (3d Cir. 2020) (citing *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984)). It is reasonable for a corrections officer to use OC spray to effectuate removing a prisoner from his cell when the inmate has refused multiple orders to come to the door to submit to handcuffing. *See Easley v. Tritt*, 2021 WL 978815, at *15 (M.D. Pa. Mar. 16, 2021) (after inmate ignored several orders to come to his cell's door and submit for handcuffing, using OC spray to gain compliance); *Jones v. Wetzel*, 2017 WL 4284416, at *7–10 (M.D. Pa. Sept. 27, 2017) (granting summary judgment on excessive force claim where officer reasonably used three bursts of OC spray when inmate would not return items from his cell, covered his cell window, and refused multiple orders to uncover it). There is also a reasonable relationship between the use of OC spray and the need to prevent Martin from hanging himself when he ignored two orders to do so because "the unplanned use of force was required to prevent [the plaintiff] from hurting himself." *Gibson*, 837 Fed. Appx. at 862. Before using force, Nurse Johnson told officers that the Medical Department had cleared Martin for OC spray, supporting its reasonableness.

Martin also contends that his strip search amounted to excessive force because he was allegedly subjected to an "anal cavity search." ECF No. 5, p. 3. By contrast, Hollis stated in his unsworn declaration that Martin experienced a "routine strip search." ECF No. 119-1, p. 53, ¶ 10. He added, "An anal cavity search requires a higher level of institutional approval and would need to be conducted by a medical professional." *Id.* The video confirms Hollis' version, not Martin's. The Supreme Court has made clear that strip searches are permissible in prisons as long as they are performed in a reasonable manner. *Bell v. Wolfish*, 441 U.S. 520, 559–60, 99 S. Ct. 1861, 60 L.Ed.2d 447 (1979). Even routine strip searches of inmates have been found to support a legitimate penological interest in maintaining institutional security. *See, e.g., Cook v. Corbett*, 2015 WL 4111692, at *5 (E.D. Pa. July 8, 2015). This strip search served a legitimate penological interest and, as Hollis

stated, "is typical practice when an inmate blocks his cell windows, to ensure an inmate did not attempt to hide contraband on his person while out of view from prison staff." ECF No. 119-1, p. 50, ¶ 9. That none was found is immaterial because the law requires evaluating the perspective of officers on the scene, not hindsight. Additionally, handcuffing Martin and generally restricting his movements by holding his upper arms and carrying him when he refused to walk—incidental to removing him from his cell, cleaning OC spray from his eyes, and the strip search—were all appropriate actions under the circumstances.

Martin's assertion in his complaint that officers "hit" him and "touch[ed]" him with "excessive force" when they returned him to his cell the first time, *see* ECF No. 5, p. 3, is plainly contradicted by the video evidence. Of course, "[p]unching and kicking someone who is handcuffed behind his back and under the control of at least six prison guards as he is being thrown into cabinets and walls is 'repugnant to the conscience of mankind,' absent the extraordinary circumstances necessary to justify that kind of force." *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002) (*citing Hudson*, 503 U.S. at 10, 112 S. Ct. 995). But nothing of the kind occurred here. When officers returned him to his cell the first time, Martin yelled that officers hit and punched him. Martin is visible very nearly the entire time. While in the camera's view, no one hits him. Even in the few seconds when Martin is not visible, the two officers holding him are visible. A careful frame-by-frame analysis belies any inference these officers struck him. Neither officer cocked his arm or shoulder or otherwise displayed any motion that could be interpreted as hitting Martin. Likewise, Martin showed no sign of injury whatsoever. Martin's assertion that officers inserted their fingers in his anus is also belied by the video. Martin's unsworn affidavit also says that he "was slam[med] into the [cell's] wall and hit." ECF No. 126, p. 19. Again, this is contradicted by the video; while also in clear view of the camera, Martin twice tried to thrust his own shoulder into the wall and blamed it on the officers. No reasonable jury viewing this video could conclude that any

officer used excessive force on Martin. The video evidence contradicts any accusations that the officers were sadistic, malicious, or punitive.

Viewed in the totality of the circumstances and in the light of the video evidence, a jury could not reasonably find that the officers' actions to gain control of Martin and restrain him on May 29, 2018 were excessive. Thus, the second *Whitley* factor weighs in favor of summary judgment for all Defendants.

The third *Whitley* factor—"the extent of the injury inflicted"—also favors summary judgment. *Brooks*, 204 F.3d at 106. Martin's two exposures to OC spray were minor for purposes of Eighth Amendment excessive force analysis. *See Gibson*, 837 Fed. Appx. at 862 ("temporary discomfort of the OC spray" did not support a constitutional violation); *Jones*, 2017 WL 4284416, at *8–10 (OC spray-induced asthma attack insufficient injury). The video shows no other injuries, and Martin has provided no record evidence to support his allegations that officers injured him. Medical notes from Nurse Johnston noted no injuries to Martin on May 29, 2018. ECF No. 129-1, p. 11.

The fourth *Whitley* factor requires the Court to consider the extent of the threat presented by the inmate to the safety of staff and other inmates as reasonably perceived by the responsible officials based on the facts known to them. *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009). As stated above, Martin was repeatedly uncooperative. He stated multiple times that he would hurt himself, and Martin's apparent attempt to hang himself justified officers using OC spray to prevent this harm. This factor supports summary judgment.

The fifth *Whitley* factor also supports summary judgment because the record demonstrates that the Defendants made "efforts … to temper the severity of a forceful response." *Brooks*, 204 F.3d at 106. Video shows officers repeatedly seeking to deescalate the tense situation and avoid or reduce the use of force. Before both uses of OC spray, officers gave multiple orders for Martin to voluntarily submit for handcuffing. Officers ignored Martin's apparent attempt to provoke them

when he told them that it was time to "roll" and exercised patience when Martin refused to comply with his strip search. And the officers limited their force to OC spray, holding Martin by his upper arms, carrying him, conducting a strip search, and applying other physical contact incidental to moving him between his cell, the Medical Department, and the strip cage. The officers' restraint means that the fifth *Whitley* factor favors the Defendants.

Thus, all five factors support summary judgment for the Defendants. The foregoing analysis confirms that no reasonable jury could conclude that the officers used excessive force against Martin on May 29, 2018. Accordingly, all Defendants are entitled to summary judgment on this claim.

   B. The Defendants Are Entitled to Summary Judgment on Martin's Conditions of
      Confinement Claim.

Martin's Complaint alleged that Defendants Mason, Mrozek, and Kopp removed all his property from his cell on May 29, 2018, leaving him without a mattress, blanket, clothes, or shoes (despite the initially wet floor) for eight days, until June 5, 2018. ECF No. 5, pp. 3-4. Martin has submitted no evidence supporting this claim, and even if he had, Defendants would be entitled to summary judgment. To succeed on a conditions of confinement claim under the Eighth Amendment, a plaintiff must establish that: "(1) he was incarcerated under conditions imposing a substantial risk of serious harm, (2) the defendant-official was deliberately indifferent to that substantial risk to his health and safety, and (3) the defendant-official's deliberate indifference caused him harm." *See Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2015). Conditions of confinement violate the Eighth Amendment if they, "alone or in combination...deprive inmates of the minimal civilized measure of life's necessities." *See Bistrian*, 696 F.3d at 347. Such necessities include "adequate food, clothing, shelter, and medical care." *See Farmer*, 511 U.S. at 832, 114 S. Ct. 1970. Thus, "extreme deprivations are required to make out a conditions-of-confinement claim," *see Hudson*, 503 U.S. at 9, 112 S. Ct. 995, although, "[s]ome conditions of confinement" insufficient on their own to establish a claim may violate the Constitution "only when they have a mutually enforcing effect that produces

the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019) (quoting *Wilson*, 501 U.S. at 304, 111 S. Ct. 2321, and *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L.Ed.2d 59 (1981)).

Even if Martin lacked a mattress, blanket, and more clothing for approximately eight days (assertions unsupported by record evidence), courts have found that these deprivations do not violate the Eighth Amendment. *See Freeman v. Miller*, 615 Fed. Appx. 72, 77 (3d Cir. 2015) (denial of clothing and mattress for seven days); *Adderly v. Ferrier*, 419 Fed. Appx. 135, 139-40 (3d Cir. 2011) (denial of clothing and mattress for seven days); *Easley v. Tritt*, 2021 WL 978815, at *11 (M.D. Pa. Mar. 16, 2021) (inmate denied a mattress, linens, clothes, and toilet paper many times). Martin himself caused these deprivations. His property had to be removed from his cell because of OC spray contamination, Hollis said. ECF No. 119-1, pp. 49-50, ¶ 7. Hollis further explained, "It is a typical practice to remove the contents of an inmate's cell for a short period of time, typically a few days, after an inmate is determined to have used items of his cell to block his cell windows or barricade himself in his cell." ECF No. 119-1, p. 50, ¶ 8. Moreover, Hollis explained, "It is also standard, after an inmate is observed attempting to hang himself, to remove blankets, sheets, towels, or anything that could potentially be used by an inmate to further harm himself as a safety measure." ECF No. 119-1, p. 50, ¶ 14. Martin has not contradicted this evidence. And these are reasonable practices under the circumstances. Also, the floor was wet because staff took care to clean residual OC spray from Martin's cell. *See Green v. Inservco Ins. Servs., Inc.*, 2010 WL 3943727, at *3-4 (D.N.J. Oct. 6, 2010) (water on cell's floor insufficiently serious deprivation; collecting cases). Martin complains of conditions he himself brought about. Even if unpleasant, these conditions fall far short of violations of the Eighth Amendment, which "does not mandate comfortable prisons" for those convicted of crimes. *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). The Defendants are entitled to summary judgment on this claim.

C. The Defendants Are Entitled to Summary Judgment on Martin's Claim That They Failed to Protect Martin from Suicide.

It is unclear whether Martin is also raising an Eighth Amendment deliberate indifference claim against the Defendants for ignoring his risk of suicide or self-harm. The Court will "apply the applicable law" regardless of whether Martin has mentioned it by name because he is *pro se*. *Holley*, 165 F.3d at 247-48. An inmate raising a failure to protect claim must allege that a prison official both knew of and chose to disregard an "excessive risk to inmate health or safety." *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2011) (citing *Farmer*, 511 U.S. at 837, 114 S. Ct. 1970). To support a claim of deliberate indifference to risk of self-harm or suicide, the plaintiff must set forth facts suggesting that (1) he "had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers 'acted with reckless indifference' to [his] particular vulnerability." *See Hinton v. Mark*, 544 Fed. Appx. 75, 77 (3d Cir. 2013) (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991)). *See also Coit v. Luther*, 2020 WL 4260765, at *9 (M.D. Pa. July 24, 2020) (*Colburn*'s standard for pretrial detainees applies equally to convicted prisoners in the Third Circuit) (citations omitted).

Here, officers responded promptly to both instances when they observed Martin appear to attempt to hang himself in his cell. The first time, the handheld camera operator notified an officer behind him just after Martin leaned back with his jumpsuit tied around his neck. This officer left, and in less than a minute and fifty seconds, Lt. Hollis and the officers returned, gave Martin two orders to submit for handcuffing, and used OC spray to stop him from continuing his apparent efforts to harm himself. Reacting to the OC spray, Martin released the jumpsuit from around his neck. Following Martin' initial attempt at self-harm, officers gave him a paper smock, which according to Lt. Hollis, "are standard issue after an inmate would attempt to hang himself, to ensure that it could not happen again." ECF No. 119-1, p. 50, ¶ 12-13. When Martin was returned to his cell for the second time and he again attempted to harm himself, the handheld camera operator

summoned other officers. They returned to his cell, but by this time, Martin was no longer trying to hurt himself. The officers showed care to prevent Martin's self-harm, not deliberate indifference. Summary judgment is warranted on this claim.

        D.  The Defendants Are Entitled to Summary Judgment on Martin's Claim of Deliberate Indifference to a Serious Medical Need.

Martin raises two claims of deliberate indifference to his serious medical needs under the Eighth Amendment. To establish a violation of his constitutional right to adequate medical care, a plaintiff must demonstrate, (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

Martin has submitted no evidence to support a genuine issue of material fact that his feet became infected after his return to his cell. ECF No. 5, p. 4. Indeed, "stray, conclusory comments" cannot survive summary judgment because they fail to "amount to cognizable claim[s]." *Hammonds v. Collins*, 2016 WL 1621986, at *3 (M.D. Pa. Apr. 20, 2016). Although his unsworn declaration says that his feet developed a fungal infection, ECF No. 126-2, p. 3, the Court is not "required to accept unsupported, self-serving testimony as evidence sufficient to create a jury question." Even if he did develop an infection, he was prescribed an anti-fungal cream a week later. ECF No. 126-2, p. 5. Because Martin received medical attention here, a "mere disagreement as to the proper medical treatment" cannot establish a constitutional violation. *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).

In support of his medical neglect claim concerning the use of OC spray, Martin asserted that Defendant Johnson "acted with neglect as she only clean Plaintiff (sic) eyes and ignored Plaintiffs (sic) pleas." ECF No. 5, p. 3. "[C]ourts have held that the failure to decontaminate prisoners or otherwise provide medical treatment for prisoners exposed to pepper spray can support a claim for a violation of the Eighth Amendment." *Bomar v. Wetzel*, 2020 WL 907641, at *5 (W.D. Pa. Feb. 3, 2020) (citations omitted). Here, however, the video evidence shows that officers immediately took

Martin to the Medical Department after both exposures to OC spray, and Nurse Johnson promptly flushed out his eyes. Martin's contention that he should have been permitted to decontaminate his whole body does not support a claim because it is undisputed he received medical treatment for his exposure to OC spray; Martin's assertion that he should have received additional decontamination is merely a "disagreement as to the proper medical treatment," which cannot support a constitutional violation. *Spruill*, 372 F.3d at 235. Summary judgment is appropriate on this claim.

### E. Martin Exhausted His Administrative Remedies Concerning His Fourteenth Amendment Due Process Claim.

The Defendants argue that they are entitled to summary judgment on Martin's Fourteenth Amendment due process claim related to the disposal of his personal property because Martin failed to exhaust his administrative remedies as to this claim prior to commencing this action. ECF No. 116, ¶ 12. Defendants point out that as of August 3, 2018, when Martin filed this action, ECF No. 1, Martin's grievance had been remanded by SOIGA for further review at the prison, and no decision was issued on remand until August 16, 2018. ECF No. 119-1, pp. 35–38. Following the denial of his grievance on remand, Martin appealed that denial to SOIGA for final review on August 19, 2018. *Id.* at p. 37. Based on this sequence, Defendants assert that they are entitled to judgment as a matter of law on Martin's Fourteenth Amendment claim. As discussed below, Defendants are incorrect.

The Court must address Martin's exhaustion defense as a threshold matter before evaluating the sufficiency of his due process claim. *See Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 304–05 (3d Cir. 2020) (properly raised exhaustion is a threshold matter for the district court). The PLRA mandates that prisoners exhaust all available administrative remedies before bringing a lawsuit concerning conditions of their confinement. 42 U.S.C. § 1997e(a). This requirement applies to all claims relating to prison life that do not implicate the duration of the prisoner's sentence. *Porter v.*

*Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L.Ed.2d 12 (2002). The plaintiff's failure to exhaust available administrative remedies is an affirmative defense that the defendant must plead and prove. *Jones v. Bock*, 549 U.S. 199, 216, 127 S. Ct. 910, 166 L.Ed.2d 798 (2007); *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018) (citing *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002)).

Proper exhaustion under the PLRA requires that an inmate "complete the administrative review process in accordance with the applicable procedural rules." *Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (citing *Woodford*, 548 U.S. at 88, 126 S. Ct. 2378). Individual prisons provide these procedural rules. *Jones*, 549 U.S. at 218, 127 S. Ct. 910; *Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004) (determining whether "a prisoner has 'properly' exhausted a claim…is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances"). Thus, a court determines whether a plaintiff has properly exhausted administrative remedies according to the procedures and rules adopted by the plaintiff's correctional institution. *Spruill*, 372 F.3d at 230-31 (the "prison grievance procedures supply the yardstick for measuring procedural default."). As the Supreme Court has explained:

> Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust." The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

*Jones*, 107 U.S. at 217, 127 S. Ct. 910.

Several administrative remedy processes provide inmates in the custody of the Pennsylvania DOC with an avenue to challenge aspects of their confinement. *See McClain v. Alveriaz*, 2009 WL 3467836, at *6 (E.D. Pa. Oct. 26, 2009) (citations omitted). Which of these policies applies in a given instance depends on the subject matter of the inmate's grievance and his or her custody

classification. *Id.* The Inmate Grievance Policy, DC-ADM 804, which provides the relevant grievance procedures for all grievances not connected with a misconduct citation, is relevant here.

The DC-ADM 804 grievance system consists of three separate stages: initial review, appeal, and final review. First, within fifteen days of the incident, the prisoner is required to submit a written grievance for review by the facility manager or the regional grievance coordinator, who, in turn, must respond in writing within fifteen business days. Second, if the grievance is denied, the inmate must submit a written appeal to the Facility Manager within fifteen working days, and again the inmate is to receive a written response within fifteen working days. Finally, if the inmate remains dissatisfied following this second level outcome, he must submit an appeal to the Secretary's Office of Inmate Grievances and Appeals (SOIGA) within fifteen working days, and then the inmate will receive a final determination in writing within thirty days.[5] *Downey v. Pa. Dep't of Corrs*, 968 F.3d 299, 305-06 (3d Cir. 2020). If instead of a final determination, SOIGA remands the grievance to the facility, the inmate must await a new decision, and then follow applicable procedures to appeal this new decision to SOIGA. DC-ADM 804, § 2(B)(2)(g). An inmate has not properly exhausted the grievance until SOIGA issues its final determination.

To establish the plaintiff's failure to exhaust administrative remedies at the summary judgment stage, the moving party must produce a record demonstrating his entitlement to judgment on the defense as a matter of law. Fed. R. Civ. P. 56(c)(1)(A). Often, the most efficacious means to do so is for the defendant to produce the plaintiff's entire grievance record. *See, e.g., Green v. Maxa*, 2019 WL 1207535, at *6 (W.D. Pa. Mar. 14, 2019); *Jackson v. Superintendent Greene SCI*, 671 Fed. Appx. 23, 24 (3d Cir. 2016). When the plaintiff misses a step in the grievance process, however, the defendant should provide an affidavit from a person with knowledge or a properly authenticated

---

[5] Policy Statement: Inmate Grievance System: DC-ADM 804, effective May 1, 2015, is available at:
https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/804%20Inmate%20Grievances.pdf.

business record affirming factually that the plaintiff failed to properly exhaust. *See* Fed. R. Civ. Pro. 56(c)(4). This is often an affidavit from a records custodian. *See Wiggins v. Correct Care Solutions, LLC*, 2017 WL 11550519, at *5, *7-8 (E.D. Pa. May 9, 2017); *Muhammad v. Sec'y Pa. Dep't of Corrs.*, 621 Fed. Appx. 725, 727 (3d Cir. 2015) (affidavit attesting plaintiff failed to appeal to SOIGA); *accord Martin v. Pa. Dep't of Corrs.*, 395 Fed. Appx. 885, 886 (3d Cir. 2010) (affidavit stating plaintiff "never sought final review"). However, an affidavit is unnecessary to show failure to exhaust when it is plain on the face of the submitted grievance record that the inmate filed suit before completing the administrative remedy process.

In support of their exhaustion defense, the Defendants have produced records from two grievances Martin filed about the May 29, 2018 incident: Grievance # 740787 and # 740433. ECF No. 119, pp. 15–47. Martin filed # 740433 on June 5, 2018, about the loss of his property. The grievance officer upheld it in part and denied it in part on June 14, 2018. On appeal, the facility manager upheld this decision on July 11, 2018. SOIGA remanded the grievance on August 2, 2018, because an offer for reimbursement had not yet been made and SOIGA could not issue a final decision until then. In the meantime, Martin mailed his motion to proceed *in forma pauperis* and attached complaint on July 31, 2018, which was filed on the docket on August 3, 2018. ECF No. 1. After this, SCI-Forest made a monetary offer to cover Martin's lost property (which he denied), the facility manager again upheld in part and denied in part the grievance, and SOIGA issued a final appeal decision on September 6, 2018, denying the grievance.

Plainly, Martin initiated this lawsuit before SOIGA issued its final determination on his grievance regarding the disposal of his personal property. But early in this case, SOIGA issued its final determination, effectively concluding the administrative process on Martin's grievance. When a prisoner does not exhaust his administrative remedies, his "complaint should be dismissed without prejudice to its reinstatement [after exhaustion]." *Ghana v. Holland*, 226 F.3d 175, 184 n. 4 (3d Cir.

2000) (alteration in original). This approach also applies where a prisoner began but did not complete the exhaustion process before he filed his complaint. Further, where a prisoner prematurely files his lawsuit but then shows that he has exhausted his administrative remedies before a motion to dismiss or other dispositive motion is filed, the court may not dismiss the action based on his premature commencement of suit. Under *Garrett v. Wexford Health*, a district court may view *pro se* filings informing the court that the prisoner completed the grievance process as supplements to his complaint. 938 F.3d 69, 81, 81 n. 17 (3d Cir. 2019) (rejecting the defendants' argument that a filing could not qualify as a supplemental complaint because the plaintiff did not move for leave to supplement). Here, the record is clear that Martin exhausted his administrative remedies when SOIGA issued a final appeal decision on September 6, 2018. Although this determination came after Martin commenced this action, it effectively cured Martin's procedural misstep. Accordingly, Defendants are not entitled to summary judgment on their exhaustion defense.

> F. The Defendants Are Nevertheless Entitled to Summary Judgment on the Merits of Martin's Due Process Claim Because He Had an Adequate Post-Deprivation Remedy.

The Defendants argue that Martin's due process claim for the loss of his property fails on the merits because he had an adequate post-deprivation remedy available through the official SCI-Forest inmate grievance system. ECF No. 116, ¶ 15. Courts have long recognized that the Due Process Clause was promulgated to protect individuals from the arbitrary exercise of the powers of government, and it guarantees the availability of certain procedural mechanisms, such as the right to notice and a hearing, before the government can deprive an individual of property. *See, e.g.*, *Pettaway v. SCI Albion*, 2012 WL 366782, at *3 (W.D. Pa. Feb. 2, 2012). The Supreme Court of the United States has held that neither negligent nor intentional deprivations of property violate the Due Process Clause if there is a meaningful post-deprivation remedy for the loss. *See Hudson v. Palmer*,

468 U.S. 517, 533, 104 S. Ct. 3194, 82 L.Ed.2d 393 (1984); *Parratt v. Taylor*, 451 U.S. 527, 530, 101

S. Ct. 1908, 68 L.Ed.2d 420 (1981). For claims that prison officials confiscated inmate property,

> the DOC's grievance procedure provides an adequate post-
> deprivation remedy, *see, e.g., Tillman v. Lebanon County Corr. Fac.*, 221
> F.3d 410, 422 (3d Cir. 2000), and…the existence of this post-
> deprivation remedy forecloses any due process claim, *Austin v.*
> *Lehman*, 893 F. Supp. 448, 454 (E.D. Pa.1995) even if an inmate is
> dissatisfied with the result of the process. *Iseley v. Horn*, 1996 WL
> 510090, at * 6 (E.D. Pa. Sept. 3, 1996). As [the inmate plaintiff]
> admits to having used the grievance procedure to attempt the return
> of his [property], he had access to an adequate post-deprivation
> remedy and even if there had been a violation of his liberty interest
> he was not denied the right to due process of law.

*Pettaway*, 2012 WL 366782, at *3. *See also Banks v. Beard*, 2006 WL 2192015, at *15 (W.D. Pa. Aug. 1,

2006) (regarding inmate plaintiff's claim that he was permanently dispossessed of his property, "[t]he

Commonwealth of Pennsylvania provides an adequate post deprivation remedy in the forms of the

DOC grievance system and/or a state law tort law suit against the Defendants…[which] satisfy the

Fourteenth Amendment's procedural due process guarantee") (citations omitted); *Monroe v. Beard*,

536 F.3d 198, 210 (3d Cir. 2008) (per curiam) (holding that failure to give an inmate "prior notice of

their intended seizure of [his] materials [does] not violate [his] Due Process rights" "because prisons

are constitutionally required to afford inmates only a post-deprivation remedy").

Martin acknowledges that he used the DOC's grievance process to remedy the loss of his

property. During the grievance process, Martin rejected prison officials' financial offer to cover the

costs of items lost, and he incorporated this claim into his current lawsuit. ECF No. 119, p. 33. The

availability of an adequate post-deprivation remedy satisfies his procedural due process rights, *see*

*Monroe*, 536 F.3d at 210, despite his dissatisfaction with the outcome. *See Iseley*, 1996 WL 510090, at

*6. Martin's procedural due process claim is without merit. The Defendants are entitled to

summary judgment on this claim.

G.  The Defendants Are Entitled to Summary Judgment on Martin's Access to Courts Claim Because Martin Has Produced No Evidence to Support It.

The Defendants contend in their reply brief that Martin has raised an "access to courts" claim for the first time in his briefing in response to the motion for summary judgment.  ECF No. 137, p. 2.  Although the allegations of the Complaint regarding this claim are sparse, the Court is satisfied that the Complaint adequately raised it, particularly given the appropriate liberality afforded to *pro se* filings.  *See, e.g., Haines*, 404 U.S. at 520-21.  ECF. 5, p. 7; ECF No. 127, pp. 1–3.  The Defendants also argue that Martin's access to courts claim fails on the merits.  ECF No. 137, pp. 2-3.  On this point, the Defendants are correct.

Under the First and Fourteenth Amendments, prisoners retain a right of access to the courts.  *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008) (citing *Lewis v. Casey*, 518 U.S. 343, 346 (1996)).  Where a prisoner asserts that a defendant's actions have inhibited his opportunity to present a past legal claim, he must allege facts to show that: (1) he "suffered an 'actual injury' in that [he] lost a chance to pursue a 'nonfrivolous' or 'arguable' underlying claim"; and (2) he has "no other 'remedy that may be awarded as recompense' for the lost claim other than in the present denial of access suit."  *Id.* at 205-06 (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)).  A plaintiff must also demonstrate that the denial of access caused an alleged injury to occur.  *Tinsley v. Gloria*, 369 Fed. Appx. 378, 381 (3d Cir. 2010) (citing *Lewis*, 518 U.S. at 352–54).  An "actual injury" for an access to courts claim may "include a court dismissal of a complaint [or] an inability to even file a complaint."  *Booth v. King*, 346 F. Supp. 2d 751, 758 (W.D. Pa. 2004) (citing *Lewis*, 518 U.S. at 351).  Other examples include "missed court dates, missed filing deadlines, a denial of legal assistance to which he was entitled, or the loss of a case which he should have won."  *See Fortes v. Harding*, 19 F. Supp. 2d 323, 327 (M.D. Pa. 1998).  The *sine qua non* of a "viable claim of interference with access

to the courts is a showing by the inmate of direct injury to [his] access to the courts." *Reynolds v. Wagner*, 128 F.3d 166, 183 (3d Cir. 1997) (internal citations and quotations omitted).

Martin has offered neither factual allegations nor evidence to the essential elements of his access to courts claim. Martin has not identified how any underlying legal claim has been lost or impaired. *Harbury*, 536 U.S. at 417-18. The scant information Martin has provided regarding other legal cases is attached to one of his briefs, and includes an information charging him with eight counts of assault, an affidavit from another inmate tangentially related to those assault charges, and some letters from a non-profit legal organization. ECF No. 127-1. Martin has failed to provide any information concerning the resolution of the proceedings, his lost legal remedy, or how the loss of his legal papers hindered his pursuit of a meritorious claim. ECF No. 5, p. 7; ECF No. 127, pp. 1–3. Failure to "produce any evidence" about the lost legal claim misses the mark. *Singleton v. Robinson*, 679 Fed. Appx. 110, 113 (3d Cir. 2017). *See also Angle v. Smeal*, 2014 WL 4414917, at *5 (W.D. Pa. Sept. 5, 2014) (dismissing access to courts claim where "Plaintiff merely [made] the bald assertion that he 'lost his criminal case as a result to this theft of his property'").

His Complaint's oblique reference to the case numbers of two cases in other courts is also inadequate. ECF No. 5, p. 7. *See Monroe*, 536 F.3d at 206 ("The complaint must describe the underlying arguable claim well enough to show that it is 'more than mere hope,' and it must describe the 'lost remedy.'") (quoting *Harbury*, 536 U.S. at 416-17). As the Third Circuit has often said, "summary judgment is essentially 'put up or shut up' time for the non-moving party," so Martin "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *See, e.g., Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). Martin has failed to "put up." Therefore, the Defendants are entitled to summary judgment on Martin's access to courts claim.

## H.  The Defendants Are Entitled to Summary Judgment on Martin's Retaliation Claims.

Martin's Complaint asserts that Defendants Sloan, Mason, Kopp, Lee, and Mrozek thew away his property as a "retaliatory tactic."  ECF No. 5, ¶ 8.  He also asserts that the use of force in removing him from his cell was retaliatory.  *Id.*, ¶¶ 2, 4.  The Defendants' motion argues that Martin has failed to state a claim for retaliation, much less support one on summary judgment.  ECF No. 116, ¶ 13.

To prevail on his retaliation claims, Martin must demonstrate that: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take the adverse action.  *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (citing *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001)).  If Martin satisfies his burden, the Defendants may still prevail if they prove by a preponderance of the evidence that they would have taken the same action absent the protected conduct.  *Rauser*, 241 F.3d at 333-34.  *See also Corliss v. Varner*, 247 Fed. Appx. 353, 355 (3d Cir. 2007).

An "adverse action" is one that would "deter a person of ordinary firmness" from exercising his First Amendment rights.  *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)).  This is an objective inquiry.  *See Bistrian v.* Levi, 696 F.3d 352, 376 (3d Cir. 2012).  "Government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right."  *Id.* at 224 (internal quotation marks and citation omitted).  The retaliatory conduct "need not be great in order to be actionable" but must be "more than *de minimus.*"  *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (internal quotations omitted).  Retaliatory motive can be inferred from either: (1) an unusually suggestive temporal

proximity between the protected activity and the alleged retaliatory action; or (2) a pattern of antagonism coupled with timing that suggests a causal link. *Id.* (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). That said, "'[t]hese are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000) (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)).

The Defendants first argue that Martin has not demonstrated that he engaged in any constitutionally protected conduct. Specifically, they contend that a request for a meeting with someone from the psychology department is not constitutionally protected activity for purposes of a retaliation claim. The Defendants have some legal support for this position. *See Mullin v. Balicki*, 2019 WL 2315044, at *4 n. 3 (D.N.J. May 31, 2019). Even assuming Martin has satisfied the basic element of his retaliation claim, however, the claim still fails because the record demonstrates that each of the actions challenged as retaliatory was supported by a penologically sound reason, and the Defendants made the decision absent the protected conduct. As other courts in this district have noted, "district courts must view prisoners' retaliation claims with sufficient skepticism to avoid becoming entangled in every disciplinary action taken against a prisoner." *Brown v. Wexford Health Sources*, 2021 WL 958459, at *3 (W.D. Pa. Mar. 15, 2021) (collecting cases).

Martin identifies two adverse actions by prison officials that he alleges were retaliatory: (1) the corrections officers' removal of him from his cell, and (2) the subsequent removal of his personal property from his cell. Inmates are prohibited from covering their cell windows due to safety concerns. ECF No. 119-1, p. 50, ¶ 9. When an inmate does so, a strip search is necessary to ensure that he has not hidden contraband on his person. *Id.* In this case, Martin's noncompliance with instructions and acts of self-harm also necessitated the use of OC spray. After the use of the OC spray, Martin's property was removed from his cell so that the cell could be cleaned. *Id.*, pp. 49-

50, ¶ 7. These are rational, legitimate penological interests that satisfy the Defendants' burden that they would have made the same decisions regardless of any (assumed) protected activity. *Horn*, 241 F.3d at 334. *See also McLaughlin v. Hart*, 2015 WL 13738991, at *12 (M.D. Pa. July 15, 2015) (prisoner's retaliation claim failed for the "straightforward reason: there were obvious legitimate penological bases underlying the decision" that he identified as retaliatory), *report and recommendation adopted by*, 2016 WL 921997 (M.D. Pa. Mar. 10, 2016), *aff'd*, 664 Fed. Appx. 135, 138-39 (3d Cir. 2016); *Williams v. Gavins*, 2015 WL 65080 , at *11 (M.D. Pa. Jan. 5, 2015) ("the unchecked evidence indicates that the defendants had an adequate and independent basis for each of the challenged searches, and that these searches would have been undertaken regardless of whether the plaintiff was involved in litigation, as part of a legitimate penological interest, including routine cell searches and institution-wide shakedowns aimed at prison security"); *Marshall v. Sobina*, 2015 WL 1508388, at *8 (W.D. Pa. Mar. 31, 2015) (defendant corrections officers "met their burden of demonstrating, by a preponderance of the evidence, that their actions would have been the same, *i.e.* they have come forward with 'some evidence' that the same decision would have been made…for a 'reason reasonably related to a legitimate penological interest.'"). Martin has not produced any evidence to counter the legitimate, penological reasons for his extraction from his cell, his strip search, or the removal of his property from his cell on May 29, 2018.

Finally, regarding Martin's claim that unspecified Defendants discarded his property as an act of retaliation, Martin has failed to support this claim with any evidence. Nothing in the record supports Martin's assertion that any Defendants intentionally threw away his property as retaliation because he requested to be seen by the Psychology Department. Thus, no genuine dispute of material fact remains regarding any aspect of Martin's retaliation claim, and the Defendants are entitled to judgment as a matter of law on this claim.

I.  Defendants Are Entitled to Summary Judgment on Martin's Sixth Amendment Claim.

Once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings. *United States v. Wade*, 388 U.S. 218, 227–228, 87 S. Ct. 1926, 18 L.Ed.2d 1149 (1967); *Powell v. Alabama*, 287 U.S. 45, 57, 53 S. Ct. 55, 77 L.Ed. 158 (1932). The Sixth Amendment also guarantees criminal defendants the right to a fair and speedy trial. *Doggett v. United States*, 505 U.S. 647, 651, 112 S. Ct. 2686, 2690, 120 L.Ed.2d 520 (1992).

The Defendants correctly argue that nothing alleged in his Complaint or supported by the record implicates any right secured by the Sixth Amendment. *See Rega v. Sw. Area Agency on Aging*, 2017 WL 3447889, at *6 (W.D. Pa. July 6, 2017) (holding that Sixth Amendment guarantees only apply to "criminal prosecutions") (citing *Kirby v. Illinois*, 406 U.S. 682, 690 (1972)). *See also Clouser v. Johnson*, 684 Fed. Appx. 243, 247 (3d Cir. 2017); *Anderson v Venango County, Pa.*, 458 Fed. Appx. 161, 164 (3d Cir. 2012) ("to prevail on a § 1983 claim predicated on the [Sixth Amendment's] right to a fair trial, the plaintiff must show that the government's alleged pretrial misconduct resulted in an unfair trial.") (citations omitted). Martin provides no evidence or allegations connecting his lawsuit to a criminal prosecution. Judgment as a matter of law is therefore appropriate.

J.  Defendants Are Entitled to Summary Judgment on Martin's Conspiracy Claim.

Martin's Complaint also alleged that the Defendants engaged in a "conspiracy to violate civil rights." ECF No. 5, p. 2. The Defendants correctly argue that this claim fails as a matter of law because it is unsupported by the record. ECF No. 116, ¶ 14. To survive summary judgment on a conspiracy claim, a Section 1983 plaintiff must adduce evidence suggesting that two or more persons acting under color of state law conspired to deprive him of a constitutional right. *Laurensau v. Romarowics*, 528 Fed. Appx. 136, 140 (3d Cir. 2013). "[M]ere conclusory allegations of deprivations

of constitutional rights are insufficient to state a conspiracy claim." *Tindell v. Beard*, 351 Fed. Appx. 591, 594 (3d Cir. 2009). Rather, the plaintiff "must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Capogrosso v. The Supreme Court of the State of New Jersey*, 588 F.3d 180, 184-85 (3d Cir. 2009). Martin has provided no evidence from which a reasonable factfinder could infer that the Defendants formulated and executed an agreement to violate his constitutional rights. *Carey v. Johnson*, 2008 WL 724101, at *10 (W.D. Pa. Mar. 17, 2008). The law is clear: "bare allegations of wrongdoing by a Defendant, without any substantiating proof of an unlawful agreement, are insufficient to state a conspiracy claim." *Id.* (emphasis added). Such is the case here.

V.     Conclusion

For the foregoing reasons, the Defendants are entitled to judgment as a matter of law on each of Martin's claims. An appropriate order will follow.

Entered this 8th day of July, 2021.

Richard A. Lanzillo
United States Magistrate Judge